UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INDIRA KAIRAM, M.D., Plaintiff, v. WEST SIDE GI, LLC, Defendant. | Civil Action No. ECF Case<br><br>COMPLAINT<br><br>PLAINTIFF DEMANDS A TRIAL BY JURY |

**The Parties, Jurisdiction and Venue**

1. Plaintiff, Indira Kairam, M.D. (also referred to herein as "Dr. Kairam" or "Plaintiff"), is a citizen of New Jersey.

2. Defendant, West Side GI, LLC ("WSGI"), is a New York limited liability company with a principal place of business at 619 West 54th, 8th Floor, New York, NY 10019.

3. This is an action for violations of, *inter alia*, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Equal Pay Act, 29 U.S.C. § 206(d), The Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*, New York State Executive Law § 296, New York City Human Rights Law § 8-107, declaratory relief pursuant to 28 U.S.C. § 2201, violation of New York Labor Law § 198, breach of contract, fraud, deceptive business practices, unfair competition and tortious interference claims.

4. Jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1367.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b). The events described herein took place at WSGI's place of business in Manhattan.

**Background**

6. Dr. Kairam is licensed to practice medicine in New York State. She is board certified in internal medicine and board eligible in gastroenterology. She is originally from India. She is female and 67 years old.

7. Dr. Kairam has patients who live outside of New York State, for example in New Jersey, and whose insurance payments come from outside of New York State.

8. WSGI owns and operates West Side GI, an ambulatory surgical center ("ASC") for endoscopy procedures in Manhattan. WSGI employs at least 20 employees.

9. On or about October 30, 2014, Dr. Kairam entered into a Membership Subscription Agreement to purchase a 2.65% interest in WSGI for the purchase price of $528,121.15. This amount reflects a rate of $199,291 for each percent ("unit") of WSGI purchased.

10. During the negotiations in the autumn of 2014, Dr. Peter Distler and Jordan Fowler of WSGI represented that the price was related to the financials of WSGI. Dr. Kairam wanted to purchase more units. Dr. Distler and Mr. Fowler represented that the units were related to the proportion of cases she was performing and that they would only sell her units in proportion to her work.

11. In fact, WSGI has never allowed a woman to own more than a 2.78% interest in the company, regardless of her willingness to purchase additional shares or how many cases she performs at the center.

12. When Dr. Kairam purchased her interest, WSGI, Dr. Distler and Mr. Fowler did not disclose to Dr. Kairam that they would not allow a woman to purchase additional shares.

13. From October 2014 to Autumn 2016 income and profits at WSGI increased.

14. Upon information and belief, in the Autumn of 2016, WSGI had to value the units as part of an acquisition of another doctor's practice ("the Gould Practice"). Upon information and belief at that time, each unit was valued at approximately $100,000 by WSGI.

15. Dr. Kairam discussed the independent valuation with WSGI's Board Members, including Dr. Distler and Dr. Pou. The Board Members agreed that in light of the facts, Dr. Kairam had been overcharged for her interest. The Board Members and Dr. Kairam agreed that Dr. Kairam's units should be increased to reflect the purchase price at the proper valuation. Upon information and belief, the Board never intended to increase Dr. Kairam's units when it made the agreement.

16. Dr. Distler also agreed with Dr. Kairam that her percent interest was not in proportion to her cases and that she should be compensated with additional units. Throughout 2016, he repeatedly represented to Dr. Kairam in his capacity as a Board Member that other members were leaving and their units would be allocated to her. Upon information and belief, Dr. Distler never intended to allocate units to her when he made his repeated representations on behalf of WSGI.

17. WSGI never re-allocated units to reflect Dr. Kairam's purchase price or cases, even after some members left and the units were available. Dr. Kairam never received distributions or voting rights in proportion to the price she had paid for the units.

18. Prior to purchasing the interest in WSGI, Dr. Kairam performed endoscopic procedures in her New York office, which was a fully accredited ambulatory surgical center ("ASC"). Dr. Kairam had contracts with numerous insurers. In addition to her fees, the insurers paid Dr. Kairam a facility fee for each procedure and also paid an anesthesiologist fee to an associate of Dr. Kairam for each procedure.

19. WSGI was aware that accreditation by the New York State Department of Health would take 4 to 6 months ("the transition period"). WSGI induced Dr. Kairam to begin performing endoscopic procedures at WSGI during the transition period, with Dr. Distler telling her on behalf of the Board that she would be compensated so there would be no decrease in her income. Starting on or about September 16, 2014, Dr. Kairam began performing procedures at WSGI. Upon information and belief, Dr. Distler never intended to compensate Dr. Kairam for her decrease in income when he made the representation to her.

20. During the entire transition period Dr. Kairam had the ability to continue performing her procedures in her own fully accredited ASC. In reliance on WSGI's representations, however, Dr. Kairam performed hundreds of procedures at WSGI which she could have performed in her office ASC. WSGI received the facility fees for these procedures and WSGI anesthesiologists received their fees from the insurers for the procedures Dr. Kairam performed.

21. By the end of the transition period, Dr. Kairam had suffered a loss of almost 20% in fees per procedure. At the same time, WSGI obtained a windfall of several hundred thousand dollars in facility fees and anesthesiology fees from the procedures Dr. Kairam could have performed in her office ASC.

22. Upon information and belief, WSGI has induced at least one other doctor to perform procedures at its facility instead of another facility by promising, but then failing, to ensure that the doctor received the same income regardless of the facility. Upon information and belief, WSGI repeatedly made these representations without ever intending to act on them. WSGI's representations to doctors were directed toward the end of having more consumers have their procedures done at the WSGI facility.

23. Through discussions in 2016 between Dr. Kairam and WSGI Board Member, Dr. Pou, WSGI agreed that Dr. Kairam should have been compensated for the income she lost and the windfall it gained by her performing the procedures at WSGI instead of in her office ASC in reliance on WSGI's representations. The parties negotiated to resolve the dispute and agreed that $200,000 was a reasonable compromise amount to compensate the harm to Dr. Kairam. However, after the negotiations, WSGI never paid Dr. Kairam the $200,000.

24. Both the male and female doctors at WSGI perform the same endoscopic procedures, such as colonoscopy, which require the same level of skill, effort and responsibility. All of the endoscopic procedures are performed at WSGI's facility.

25. Dr. Kairam performs more procedures at WSGI than many of the male members of WSGI, but WSGI pays her less. For example, Dr. Kairam performed more procedures than Dr. Palma, but WSGI paid her less than half what it paid Dr. Palma.

26. WSGI assigns the support personnel – tech assistants, anesthesiologists and nursing staff – to the doctors. WSGI provides the equipment, schedules the patients, schedules the doctors' times and assigns the rooms they work in, and sets professional requirements for the doctors who perform procedures at the WSGI facility, such as requiring certain hospital and insurance affiliations. WSGI also sets the standards and protocols the doctors must follow while working at the WSGI facility.

27. WSGI does not assign patients to Dr. Kairam. Dr. Kairam refers her own patients to WSGI for the procedures she performs there. Other than performing a procedure at WSGI, she meets with her patients at an office not affiliated with WSGI and has a relationship with the patient which pre-dates the choice of WSGI for a procedure.

28. WSGI cannot require Dr. Kairam to refer any particular patient to its facility. Nor can it require Dr. Kairam refer the majority of her patients to WSGI.

29. By the Autumn of 2016, WSGI had still taken no action to resolve either of the issues of the proper allocation of shares or payment for performing procedures at WSGI before Dr. Kairam became a member. Dr. Kairam entered negotiations with another endoscopy center and informed WSGI that she intended to leave. WSGI Board Members Dr. Distler and Dr. Pou induced her to stay by (1) promising to resolve the outstanding issues and by (2) offering her

employment with WSGI to perform administrative duties. Dr. Distler repeatedly made statements to the effect that "we will compensate you with shares." Upon information and belief, WSGI never intended to resolve the outstanding issues in good faith; it only intended to delay Dr. Kairam's departure.

30. Dr. Kairam had previous professional experience in medical billing, also known as Revenue Cycle Management ("RCM"). In the Autumn of 2016, Dr. Pou offered Dr. Kairam employment with WSGI at the rate of $100,000/year for a term of two years to take on administrative duties on a part-time basis. They agreed she would chair WSGI's Billing Committee and undertake a review of WSGI's billing practices to increase efficiency and revenue. The then-chair of the Billing Committee resigned so Dr. Kairam could start her job. Dr. Kairam's employment began on October 19, 2016.

31. Over a period of months, Dr. Kairam supervised WSGI personnel to, *inter alia*, analyze whether individual doctors were properly qualified for patients' insurance, whether particular doctors were experiencing problems with particular insurers, *e.g.*, whether claims were never captured or denied, analyze and address denials and correcting the identified issues to improve billing procedures at WSGI. Dr. Kairam reviewed billing and financial information, met with WSGI staff and Board members, attended regular meetings, made specific proposals to improve the billing process and undertook to implement them to improve the billing process. Dr. Kairam never received her salary for this work.

32. Dr. Kairam also provided WSGI with a template she had developed for her practice with a methodology to optimize billing. It was understood among the members of the Billing Committee that the work of the billing committee,

including documents it reviewed, was confidential. Upon information and belief, the billing contractor member of the Billing Committee had a confidentiality agreement with WSGI. Dr. Kairam did not provide the template to all the members of the committee. Upon information and belief, WSGI understood that it was receiving a confidential document for review to determine whether using the template and Dr. Kairam's methodology for implementing it would be useful to WSGI and that WSGI was not to disclose the document without Dr. Kairam's permission.

33. After WSGI purchased the Gould Practice in Autumn 2016, Dr. Distler, a younger male, began receiving a salary of $100,000/year for two years to "run the Gould Practice," which involved administrative duties at WSGI on a part-time basis.

34. Both Dr. Kairam and Dr. Distler performed their administrative duties at WSGI's facility.

35. Dr. Distler's administrative duties at WSGI involved supervising WSGI personnel to, *inter alia*, analyze whether individual doctors were properly qualified for patients' insurance, whether particular doctors were experiencing problems with particular insurers, *e.g.*, whether claims were never captured or denied, analyzing and addressing denials and correcting the identified issues to improve billing procedures at WSGI.

36. When Dr. Kairam told Board Members, such as Dr. Palma and Dr. Pou that she had never received her salary, she was told that the Board had voted and approved the position and the salary.

37. On or about August 12, 2017, WSGI's Board unanimously approved an amendment to the Operating Agreement to enact a mandatory retirement age of 70 for members of WSGI.

38. Under the Operating Agreement, only the Board has the authority to change the Operating Agreement; there is no provision for changing the Operating Agreement by a vote by members.

39. The unanimous vote by the Board approved forced retirement at age 70 by forcing the redemption of the member's shares for the value in their capital account plus the member's *pro rata* share of accounts receivable. The policy also restricts the member's ability to practice at another ASC even after WSGI forced the retirement.

40. The redemption price for forced retirement is without regard to fair market value, pending offers or any outside valuation of the price of shares.

41. The forced retirement policy divests older members of their shares at a reduced price even when other members can take advantage of a sale at a higher price. Accordingly, the policy reduces the present value of shares for doctors near the retirement age.

42. Upon information and belief, around the time the forced retirement policy was enacted, Dr. Peter Distler unilaterally prevented WSGI personnel from paying any salary to Dr. Kairam for her RCM work. The remaining Board Members did nothing to correct the situation, took no action to implement the vote they had taken to pay her and Dr. Kairam was never paid her salary.

43. The Operating Agreement Dr. Kairam was given as part of the purchase agreement never contained any mandatory retirement terms or

requirement that interests be alienated at the age of 70. After being informed that WSGI would require retirement at age 70, Dr. Kairam began to consider what she would do with her practice, including whether she should sell it.

44. The Operating Agreement Dr. Kairam was given as part of the purchase agreement did contain a provision for transferring her shares along with her practice to another doctor who comes to work at her practice. WSGI would require that doctor work at WSGI for a period of two years before that transfer could take place (in addition to the above-mentioned 4-6 months of the transition period required by New York State). Accordingly, even after finding a qualified candidate, Dr. Kairam would need more than two years lead time to be able to transfer her practice to another doctor under the terms of the Operating Agreement. The forced retirement policy did not allow enough time for Dr. Kairam to take advantage of this provision of the Operating Agreement.

45. Believing she would be forced to retire at age 70, Dr. Kairam approached colleagues in November 2017, Dr. Palma and Dr. Seecoomar, who are also board members of WSGI about acquiring her practice and her interest in WSGI. Upon information and belief, those colleagues were unwilling to purchase her shares for any price near the outside valuation because they knew they could force her to alienate her shares for significantly less under the illegal retirement policy.

46. After WSGI doctors acquired the Gould Practice in or about August 2016, Dr. Distler began referring cases from the Gould Practice to WSGI doctors, but not to Dr. Kairam.

47. During a meeting of all the doctors at WSGI in August 2017, Dr. Kairam asked why she had not been referred cases from the Gould Practice. Dr. Distler, a WSGI Board Member, said in front of all her colleagues, that it was a "boutique practice," that Dr. Koutsos, a white male, "looks like" Dr. Gould, a white male and that the patients want to see a doctor that "looks like" Dr. Gould. Dr. Distler's comments caused Dr. Kairam mental distress, embarrassment and humiliation.

48. Dr. Distler continued to refuse to refer patients to Dr. Kairam based on her not looking like a white, male doctor. The doctors who received these patients billed for procedure fees and received payments for the procedures.

49. In October 2017, PE Healthcare Associates ("PE") issued a Letter of Intent ("LOI") to acquire a 49% in WSGI based on its independent valuation which was significantly higher than any previous valuation of WSGI.

50. During the negotiations leading to the LOI, WSGI told Dr. Kairam not to do any further work on revisions to the billing practices.

51. In November 2017, through counsel Dr. Kairam informed WSGI that she has no present intent to retire, but based on her age the requirement that she agree to work for 7 years is inconsistent with the Board's position that her interest can be involuntarily alienated at age 70. Dr. Kairam also informed WSGI's counsel that none of the payment and share allocation issues had been resolved with the Board. The share allocation issue affects Dr. Kairam's voting rights and proceeds from any sale of units to PE.

52. In December 2017, WSGI's outside counsel, Jay Gerzog, Esq., represented that PE is requiring each doctor agree to work for 7 years, 40

hours/week, 40 weeks/year. Failing to do so will result in PE and WSGI involuntarily redeeming the doctor's remaining shares, not at the valuation rate and not at the forced retirement rate, but only for a portion of the balance in their capital account. In January 2018, Mr. Gerzog represented that WSGI would require that doctors who only months before had been told to prepare for mandatory retirement at age 70 would get the "same terms" – take it or leave it – as younger doctors who voluntarily left the practice before the expiration of the 7-year period.

53. WSGI's illegal forced retirement policy, the interaction of the illegal retirement policy and the Operating Agreement's terms, including the restrictions on the transfer of interests, voluntary and involuntary redemption and non-compete terms, as well as the requirement that the doctors personally perform the services for 7 years to participate in the deal with PE (as opposed to the provisions in the existing Operating Agreement that allow a doctor to have an associate from their practice perform services) all violate Federal, New York State and New York City law.

54. WSGI took no action to resolve the issues and failed to negotiate in good faith for over a year after it induced Dr. Kairam not to work at another ASC by promising to resolve the outstanding issues and provide her with a salaried position.

55. WSGI actively pursued illegal policies which aggressively targeted older members to alienate them of their interests, inhibit or prevent them from practicing medicine with another group after the age of 70 and discriminate against them in the proposed sale to PE. PE also required terms which it knew to

be discriminatory and to have a disparate impact on WSGI members at or near the age of 70, and the WSGI Board indicated it would accept the illegal terms even after Dr. Kairam and Dr. Goldberg voiced concern that the terms had a discriminatory disparate impact on the older doctors.

56. WSGI and its outside counsel were aware of the per se discrimination of the retirement policy and the disparate impact of the policy, Operating Agreement terms and PE offer and nevertheless intentionally pursued discriminatory and retaliatory policies and practices against the doctors at or near age 70, including Dr. Kairam.

57. On or about May 15, 2018, Dr. Distler told Dr. Kairam that if she did not settle this lawsuit soon it would become unpleasant for her to continue working at WSGI. In June 2018, WSGI, its counsel Rena Andoh, Esq. and Jay Gerzog, Esq. attempted to prevent Dr. Kairam from attending a meeting of Gould Practice members because she had filed a lawsuit against WSGI. They advised Dr. Kairam that they would not tell her information they deemed necessary to disclose to other Gould Practice members because she had filed a lawsuit against WSGI. Dr. Kairam has not received that information because she filed a lawsuit against WSGI.

58. WSGI paid more than $1 million in legal fees for Dr. Kairam's matter and the Gould Practice matter, including fees for the retaliatory tactics WSGI's counsel directed at Dr. Kairam in attempting to restrict her access to the Gould Practice meeting and preventing her from obtaining information about the Gould Practice. WSGI forced Dr. Kairam to pay her share of the fees. These fees were

excessive and WSGI and its Board wasted assets and failed to act in the members' interests when it paid the excessive fee amount.

59. WSGI charged Dr. Kairam for a retirement plan and then failed to enroll her in the plan. Instead, it used her premiums for other doctors. WSGI and its Board wasted assets and failed to act in the members' interests when it knowingly diverted premiums to the accounts of other doctors.

60. Plaintiff is negotiating to take her cases to one or more other ASCs. The existence of the unlawful restrictive covenant in the Operating Agreement is interfering with Plaintiff's ability to enter into agreements with other ASCs.

61. Plaintiff filed a charge with the United States Equal Opportunity Employment Commission for the ADEA and Title VII claims. The EEOC issued a Right to Sue letter on November 7, 2018. See Exhibit 1.

**Count 1: Violation of The Age Discrimination**
**in Employment Act, 29 U.S.C. § 621 *et seq.*,**

62. Plaintiff restates and realleges paragraphs 1 through 61 as if fully set forth herein.

63. By the acts, policies and practices described herein, WSGI has willfully, purposefully and intentionally discriminated against Dr. Kairam in her compensation, terms, conditions, or privileges of employment, because of her age and/or limited, segregated, or classified its employees in a way which deprives or tends to deprive her of employment opportunities or otherwise adversely affect her status as an employee and retaliated against her in violation of 29 U.S.C. § 621 *et seq*.

64. As a result of Defendant's willful discriminatory and retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages and other compensable damages.

**Count 2: Violation of Title VII**
**of The Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***

65. Plaintiff restates and realleges paragraphs 1 through 64 as if fully set forth herein.

66. By the acts, policies and practices described herein, WSGI has willfully, purposefully and intentionally discriminated against Dr. Kairam with respect to her compensation, terms, conditions, or privileges of employment, because of her color, sex, and/or national origin; and/or has limited, segregated, or classified its employees in a way which deprives or tends to deprive her of employment opportunities or otherwise adversely affect her status as an employee, because of her color, sex, and/or national origin and retaliated against her in violation of 42 U.S.C. § 2000e *et seq*.

67. As a result of Defendant's willful discriminatory and retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, emotional pain, suffering, inconvenience, mental anguish, humiliation and other compensable damages.

**Count 3: Violation of The Equal Pay Act, 29 U.S.C. § 206(d)**

68. Plaintiff restates and realleges paragraphs 1 through 67 as if fully set forth herein.

69. By the acts, policies and practices described herein, WSGI has willfully, purposefully and intentionally failed to pay Dr. Kairam equal wages and benefits because of her sex, while paying comparably employed male doctors their wages and benefits and retaliated against her in violation of 29 U.S.C. § 206(d).

70. As a result of Defendant's willful discriminatory and retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages and other compensable damages.

**Count 4: Violation of New York State Executive Law § 296**

71. Plaintiff restates and realleges paragraphs 1 through 70 as if fully set forth herein.

72. By the acts, policies and practices described herein, WSGI has discriminated against Dr. Kairam, including in the terms and conditions of her employment, based on her sex, color, national origin and/or age and retaliated against her in violation of the New York State Human Rights Law.

73. As a result of Defendant's willful, intentional and purposeful discriminatory and retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, emotional pain, suffering, inconvenience, mental anguish, humiliation and other compensable damages.

**Count 5: Violation of New York City Human Rights Law § 8-107**

74. Plaintiff restates and realleges paragraphs 1 through 73 as if fully set forth herein.

75. By the acts, policies and practices described herein, WSGI has discriminated against Dr. Kairam, including in the terms and conditions of her employment, based on her sex, color, national origin and/or age and retaliated against her in violation of the New York City Human Rights Law.

76. As a result of Defendant's willful, intentional and purposeful discriminatory and retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, emotional pain, suffering, inconvenience, mental anguish, humiliation and other compensable damages.

## Count 6: Declaratory Judgment

77. Plaintiff restates and realleges paragraphs 1 through 76 as if fully set forth herein.

78. There exists an actual controversy between Dr. Kairam and WSGI concerning the enforceability of the non-compete provision of the Operating Agreement and the mandatory retirement policy in light of the imminent need to decide whether to finalize agreements to work at other ASCs.

79. WSGI's mandatory retirement policy, its proposed employment agreement and the terms of its Operating Agreement, including the transfer provisions, voluntary and involuntary alienation of interests and the non-compete, are discriminatory in the terms and conditions of employment and unrelated to any legitimate business interest. Accordingly, Plaintiff is entitled to a declaratory judgment and injunctive relief barring enforcement of the discriminatory policies, practices and provisions and unenforceable non-compete provisions.

**Count 7: Violation of**
**<u>The Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*</u>**

80. Plaintiff restates and realleges paragraphs 1 through 79 as if fully set forth herein.

81. WSGI obtained Dr. Kairam's trade secrets for optimizing medical billing for a GI practice and ASC by fraud, artifice or deception in violation of 18 U.S.C. § 1832.

82. Dr. Kairam will suffer irreparable injury as a result of Defendant's willful, intentional and purposeful acts if the trade secrets are not returned and Defendant is not prevented from using or distributing them.

**<u>Count 8: Breach of Fiduciary Duty</u>**

83. Plaintiff restates and realleges paragraphs 1 through 82 as if fully set forth herein.

84. WSGI and its Board members breached their fiduciary duties to Dr. Kairam by, *inter alia*, (1) improperly representing the number of units purchased, (2) failing to correct the error by allocating the correct number of units to Dr. Kairam, (3) adopting the policy of mandatory retirement at age 70 and either involuntary alienation of a member's LLC interest or voluntary alienation triggering a non-compete, (4) willfully failing to pay Dr. Kairam her salary, (5) willfully failing to correct the failure to pay salary after the Board became aware that one member had blocked payment, (6) wasting assets, (7) misappropriating retirement plan premiums and (8) intentionally allocating Dr. Kairam's retirement plan premiums to other members.

**Count 9: Breach of Contract**

85. Plaintiff restates and realleges paragraphs 1 through 84 as if fully set forth herein.

86. WSGI and its Board breached contracts with Dr. Kairam by, *inter alia*, (1) failing to pay Dr. Kairam for the procedures she performed during the transition period, then (2) failing to pay Dr. Kairam the negotiated amount for her lost income, (3) overcharging her for her membership interest, (4) failing to pay Dr. Kairam her salary and (5) failing to credit her retirement plan premiums to her and instead allocating her premiums to other doctors.

87. WSGI's breaches were material and Dr. Kairam was injured by WSGI's breaches.

**Count 10: Conversion/Misappropriation**

88. Plaintiff restates and realleges paragraphs 1 through 87 as if fully set forth herein.

89. WSGI and its Board converted and/or misappropriated property from Dr. Kairam by, *inter alia*, (1) failing to pay Dr. Kairam for the procedures she performed during the transition period, then (2) failing to pay Dr. Kairam the negotiated amount for her lost income, (3) overcharging her for her membership interest, (4) failing to pay Dr. Kairam her salary and (5) failing to credit her retirement plan premiums to her and instead allocating her premiums to other doctors.

**Count 11: Fraud**

90. Plaintiff restates and realleges paragraphs 1 through 89 as if fully set forth herein.

91. WSGI knowingly and falsely (1) represented the price to Dr. Kairam for her interest was related to the value of the company, (2) represented the amount of shares she purchased was related to her proportion of procedures, (3) induced Dr. Kairam to perform her procedures at WSGI during the transition period by representing that her compensation would remain the same as if she continued to practice at her own ASC, (4) induced Dr. Kairam to stay at WSGI in 2016 when she had prepared to move to another ASC by promising to resolve her outstanding claims and promising her new employment, (5) agreed to pay $200,000 to resolve the loss of income to Dr. Kairam, (6) failed to negotiate outstanding issues in good faith and (7) charged her premiums for a retirement plan and then intentionally credited the premiums to other doctors.

92. As a result of WSGI's representations and Dr. Kairam's reasonable reliance on them, Dr. Kairam was injured.

**Count 12: Deceptive Business Practices under NY GBL § 349**

93. Plaintiff restates and realleges paragraphs 1 through 92 as if fully set forth herein.

94. WSGI deceived doctors into performing their procedures at WSGI by promising the doctors would have the same income, regardless of the facility. WSGI's deceptions affected numerous consumers whose procedures were performed at WSGI instead of other facilities.

95. Dr. Kairam was deceived by WSGI and was injured as a result of WSGI's deception.

96. As a result of WSGI's deception, patients were directed to WSGI instead of another facility and insurers and other payors directed their payments to WSGI instead of another facility.

**Count 13: Unfair Competition**

97. Plaintiff restates and realleges paragraphs 1 through 96 as if fully set forth herein.

98. At the beginning of the transition period, Dr. Kairam ran a competing ASC where she performed her procedures. WSGI's false representations induced her to let staff go and close her office ASC and perform the procedures at WSGI's facility and caused her injury before she was a member of WSGI.

99. WSGI misappropriated the billing for Dr. Kairam's ASC.

100. WSGI misappropriated Dr. Kairam's trade secrets for RCM.

101. WSGI's acts described herein constitute unfair competition under New York law.

**Count 14: Tortious Interference with Business Relations**

102. Plaintiff restates and realleges paragraphs 1 through 101 as if fully set forth herein.

103. WSGI's fraud, deceptive business practices, unfair competition and/or other tortious actions described herein interfered with the established contracts and relations Dr. Kairam had with patients and insurers.

104. As a result of WSGI's torts, insurers and other payors paid WSGI, and not Dr. Kairam's practice, the facility fees for procedures.

**Count 15: Tortious Interference with Contract**

105. Plaintiff restates and realleges paragraphs 1 through 104 as if fully set forth herein.

106. Dr. Kairam had valid contracts with insurers, other payors and patients which entitled her to payment for claims and WSGI was aware of those contracts. Dr. Kairam paid premiums for a retirement plan and WSGI was aware that those premiums were covered by a contract with a plan.

107. WSGI's fraud, deceptive business practices, unfair competition and/or other tortious actions described herein interfered with the established contracts and relations Dr. Kairam had with patients, insurers and other payors, induced them to pay the facility fees to WSGI and deprived Dr. Kairam of the fees.

108. WSGI's fraud, deceptive business practices, unfair competition and/or other tortious actions described herein interfered with the contract between Dr. Kairam and the plan provider for the retirement plan benefits and deprived Dr. Kairam of the benefits.

**Count 16: Unjust Enrichment and Quantum Meruit**

109. Plaintiff restates and realleges paragraphs 1 through 108 as if fully set forth herein.

110. Defendants received facilities fees from insurers and payments to anesthesiologists for the procedures Dr. Kairam performed at WSGI during the

transition period and Defendant received Dr. Kairam's recommendations and trade secrets for improving billing at WSGI.

111. Even should the Court determine that there was no contract, Defendant is obligated to pay Dr. Kairam for the fair and reasonable value of the loss she suffered by not performing procedures during the transition period at her office and for the services she provided to WSGI.

**<u>Count 17: Violation of NY Labor § 198</u>**

112. Plaintiff restates and realleges paragraphs 1 through 111 as if fully set forth herein.

113. WSGI agreed to hire Dr. Kairam as an employee with a salary of $100,000/year. Dr. Kairam performed her duties and was never paid anything.

114. Dr. Kairam is entitled to a judgment in the amount of $200,000 and to double damages, costs, pre-judgment interest and attorney fees for the intentional withholding of salary.

115. Alternatively, since Dr. Kairam was not paid anything, she is entitled to a judgment of her proper and reasonable wages and to double damages, costs, pre-judgment interest and attorney fees for the intentional withholding of salary.

WHEREFORE Plaintiff demands judgment:

(1) That the Court grant preliminary injunctive relief preventing the transfer of affected units until Dr. Kairam's interest in WSGI is determined;

(2) That the Court grant preliminary and permanent injunctive relief preventing the enforcement of the mandatory retirement age, requirement of 7-year employment contracts, involuntary alienation of interest and non-compete provisions of the current Operating Agreement or any future Operating Agreement, By-Laws, Board Resolution or other policy which is discriminatory and/or unenforceable;

(3) That the Court grant preliminary and permanent injunctive relief returning Dr. Kairam's template and other RCM work to her and that WSGI be preliminarily and permanently enjoined from using her RCM work or sharing it with any other party, including but not limited to other members or future members of WSGI;

(4) That Dr. Kairam be awarded additional units of WSGI in proportion to her payment for her units;

(5) That Defendant provide an accounting and provide Dr. Kairam with the retirement plan benefits she paid for;

(6) That Defendant pay compensatory damages;

(7) That Defendants pay enhanced damages, statutory and liquidated damages, punitive damages, costs and attorney fees;

(8) That Defendants pay pre-judgment interest pursuant to NY CPLR §§ 5001, 5004 at the statutory rate of 9%;

(9) That Plaintiff be awarded such other and further relief as the Court may deem just and proper.

**Jury Demand**

Plaintiff demands trial by jury.

Dated: January 31, 2019

By: Elizabeth Shieldkret

Elizabeth Shieldkret (ES 0625)
Attorney at Law
67-20 Exeter Street
Forest Hills, NY 11375

(718) 997-0290
es@eshieldkret.com

Attorney for Plaintiff,
Indira Kairam, M.D.

# Exhibit 1

EEOC Form 161-B (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE (*ISSUED ON REQUEST*)

To: **Indira Kairam**
**7400 River Road, Apt. 427**
**North Bergen, NJ 07047**

From: **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2018-03979** | **Maritza Rondon-Velazquez, Investigator** | **(212) 336-3678** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Kevin J. Berry (signature)

11/7/18
*(Date Mailed)*

Enclosures(s)

**Kevin J. Berry,**
**District Director**

cc: **Human Resources Director**
**WEST SIDE GI, LLC**
**619 West 54th Street, 8th Floor**
**New York, NY 10019**

**Elizabeth Shieldkret, Esq.**
**ATTORNEY AT LAW**
**67-20 Exeter Street**
**Forest Hills, NY 11375**